## THE ELECTRIC NO. 21.

### THE HERCULES.
### No. 53 of 1945, Admiralty.

District Court, E. D. Pennsylvania,
July 28, 1947.

Howard M. Long and Howard T. Long, both of Philadelphia, Pa., for libellant.

Rawle & Henderson, of Philadelphia, Pa., for claimant-respondent.

Shields, Clark, Brown & McKown, of Philadelphia, Pa., and Burlington, Veeder, Clark & Hupper, of New York City, for impleaded respondent.

KIRKPATRICK, District Judge.

1. At approximately 6:00 p.m. on January 11, 1945, the coal barge Electric 21, without cargo, proceeded in tow, made fast on the starboard side of the tug Hercules, from Delaware County Light Company plant at South Chester, bound to Greenwich Coal Piers; Philadelphia.

2. The Electric 21 is a coal barge 170' in length, 40' beam, depth 18', with a carry-

ing capacity of 3,000 tons, with no motive power or steering power, and her navigation was in full charge of the Hercules.

3. The tug Hercules is a steam towing vessel 93 gross and 63 net tons, 92.3' in length, 21' beam and 8.8' depth and at the time was operated and owned by The Curtis Bay Towing Company of Pennsylvania, a Pennsylvania Corporation.

4. At all times involved the tide was ebb, the weather clear and visibility good.

5. On the same evening the oil screw tug Margot Moran was proceeding from Philadelphia down the Delaware River, bound to Portsmouth, New Hampshire, with the coastwise barge Patricia Sheridan made fast on her port side, and with the Barge Gossan made fast on her starboard side. The navigation and movement of both these barges was under the control of the Margot Moran. The Patricia Sheridan was 187.2' in length and 34' beam, while the Gossan was 167.2' in length, 35.6' beam and 12.8' depth.

6. Both tugs and tows were at all times exhibiting proper lights.

7. The Hercules was navigating on her own left-hand or Pennsylvania side of the Delaware River outside the dredged channel while the Margot Moran and her flotilla were navigating in the channel of the river and were proceeding practically on the Tinicum ranges.

8. The navigators of the respective tugs observed each other in ample time and with sufficient separating space to have avoided a collision; both had ample width of navigable water in which to navigate, and there were no other vessels in the vicinity which interfered with the operation of the two flotillas.

9. Captain Morris of the Hercules was navigating her and also keeping a lookout, and the mate Caldwell was sitting in the pilot house.

10. Matthews, the mate of the Moran, now deceased, was navigating her in her pilot house, and he had with him a deckhand.

11. The Moran with her flotilla was proceeding with the tide at a speed of approximately seven miles per hour, while the Hercules and her tow were proceeding against the tide at a speed of about three miles per hour. The two flotillas thus were approaching each other at a combined speed of ten miles per hour, or approximately nine hundred feet per minute.

12. Morris, the navigator of the Hercules, saw the Moran's lights between a half mile and a mile distant. Shortly thereafter he blew a two whistle signal to indicate a starboard to starboard passing. He heard no answer to this signal. He did not repeat the signal nor were any danger signals blown by the Hercules.

13. The speed of the Hercules and her tow was not checked and she was running her full speed of three miles per hour at the time of the collision.

14. The Moran continued at a speed of seven miles per hour until she was about 200' distant from the Hercules and her tow when her master reversed her engines, and almost immediately thereafter the collision occurred.

15. The Master of the Moran first observed the green light and the towing lights of the Hercules when the two flotillas were about one mile distant from each other, and when about half a mile distant the Moran blew a one whistle signal which was not answered by the Hercules. Shortly thereafter she blew another one whistle signal which also was not answered. The Moran at no time blew any other whistle signals.

16. During their approach and up until the collision, the two tugs had not come to any passing agreement with each other.

17. The failure of the two tugs to reach a passing agreement was the proximate cause of the collision.

18. The blow of the collision was a heavy one, the bow of the Patricia Sheridan striking the starboard forward end of the Electric 21, causing serious damage, and forcing the bow of the Electric 21 into collision with the Gossan, breaking the towing lines of the Hercules and her tow and also breaking the towing lines of the Margot Moran and her tow.

## Conculsions of Law

1. The Delaware River in which the two flotillas were navigating is, under the law, a narrow channel.

2. Both tugs were required seasonably to come to a passing agreement with each other. To accomplish such passing agreements each of these tugs was required to blow whistle signals to each other when they were at a distance from each other to make the signals effective.

3. Since these two vessels were approaching each other and each failed to understand the courses and intention of the other, they were required to blow several short and rapid blasts of their respective steam whistles, not less than four, as attention or danger signals.

4. Upon the testimony of the Master of the Hercules that she had blown a two blast whistle which had not been answered, she was required to repeat that signal until she had either received an assent or the other tug had dissented or blown a danger signal of four or more blasts of her whistle.

5. The Moran was also required to repeat her one whistle signal until she had received an assent or the other tug had dissented or blown a danger signal of four or more blasts of her whistle.

6. Inasmuch as the signals blown had not been answered, the tugs had not come to a passing agreement, and they were required under the law to check their respective speeds, stop and reverse their engines. Both navigators were guilty of negligence as to their whistle signals in failing to secure a passing agreement and as to blowing of danger signals, and in failing to check their speed seasonably by stopping and reversing their engines.

7. The collision was caused by the joint fault and negligence of the navigators of the two tugs.

8. Both tugs and their respective owners must be held jointly in fault for the collision, for the resultant damage to the libellant and the Electric 21, and such damage should be divided equally between the said tugs and their respective owners.

9. The libel of the libellant against both the Hercules and her owners and against the Margot Moran and her owners and operators should be sustained with interest and costs.

### Discussion and Additional Findings.

The foregoing are, with some modifications, affirmances of the requests submitted by the libellant. A few further findings remain to be made.

The libellant (14th request) asks me to find that the Hercules, when she first sighted the lights of the Moran, saw the latter's green light and did not see her red light at any time until the vessels were almost in collision. This, it seems to me, is physically impossible in view of the other evidence, particularly Captain Morris's testimony as to the position of the Hercules when she first sighted the Moran's lights. When asked to fix the place on the chart he indicated a point, which was then marked by the letter "H". That point is past the line of the Tinicum range lights and, in fact, is beyond the northern line of the Tinicum channel, projected. If he had been at "H" when he first sighted the Moran he would probably have seen her green light and possibly both the green and the red. However, he testified positively and unqualifiedly, both on direct and cross-examination, at at least three different places in his testimony that, when he first sighted the lights of the Moran, he had not reached the intersection of the Tinicum range. In view of the character of this testimony, I can only conclude that when he fixed "H" on the chart he did not place it correctly, possibly because he was thinking of some other point in his maneuver, which might have been the point where he hauled to starboard from the line of the Chester range. For these reasons, Captain Morris's testimony that he saw only the green light cannot be accepted.

19. I therefore find, as an additional fact, that the Hercules, when she first sighted the lights of the Moran, had not crossed the line of the Tinicum range lights projected and it follows, as another finding, (20) that the Hercules, when she first sighted the Moran saw the latter's red light.

It may be added that the foregoing, while I believe it to be in accordance with the fact, is not of vital importance and would not change the result because, even assuming that the Hercules was at "H" when she first saw the Moran and that Captain

Morris saw only the Moran's green light, he was still unquestionably under a duty not to attempt a passing without having reached an agreement by signals.

The libellant's requests do not ask me to fix the point where the Moran was when she first observed the lights of the Hercules. (21) I fix the point slightly to the North of the center line of the Tinicum channel, opposite the lower end of Tinicum Island and just off the line of the range lights.

The libellant's 18th request is not affirmed. In its place I find, as requested by the claimant-respondent, that (22) "Prior to the collision, when the vessels were 200 to 300 feet apart, the Master of the Moran, who was on top of her wheelhouse, ordered the mate, who was navigating, to slow up or stop the Moran and put her wheel hard left, but the mate failed to carry out either of these orders and upon such failure the Master went below into the wheelhouse and put the engines astern shortly prior to the collision.", and I add (23) that at about that point the Moran sheered to her starboard, showing her red light momentarily to the Hercules, and immediately thereafter, without blowing any signals, straightened up on her course. I know that Judge Dickinson, in The Wachusett II-Triumph, 1933 A.M.C. 640, called the story of a sheer "a shopworn defense". In this case however there is positive testimony from the Hercules that the sheer did occur and Captain Eaton of the Moran testified not only that the mate did not put the wheel hard left when ordered to do so but that it was possible that he put it hard right. In any event, (24) the sheer was only momentary and the ships were so close together when it occurred that it was not the proximate cause of the accident. That cause was negligent failure to agree on a passing which had brought them into a position where a collision was unavoidable.

I also make the finding (25) that there was floating ice in the river on the New Jersey or south side of the channel and there may have been some in the channel on its southerly side, but there is no evidence that ice in the channel made navigation in it difficult or dangerous.

26. The Moran made no material change in course from the time she observed the Hercules until the collision occurred.

27. The Hercules, after crossing the line of the Tinicum range projected, began to haul to starboard intending to pass just inside the buoy "C" near the bend in the channel and was in the course of completing the turn when the collision occurred.

28. Both vessels checked or reversed their engines immediately before the collision and when it was too late to avoid it but, up to that point, both had proceeded at full normal speed ahead without change.

The libellant's requests for conclusions of law are generally correct but it might be well to point out the conditions existing in this case which make them specially applicable.

This was a passing situation in a narrow channel, complicated by the facts that there was a bend in the channel and that it must have been evident to both vessels that the passing would occur at or very near the bend. Without deciding whether passing without agreement by signals would have been negligent had the channel been straight and both vessels on their right side, an agreement was plainly required in this case.

The master of the Moran, when he first saw the Hercules's lights, had no idea in what part of the channel the Hercules was. What he could see was that she was on another range, approaching him obliquely and on a course, which if continued without change, would cross the course on which he was. He knew that there was a bend in the channel ahead of the Hercules but, for all he knew, the Hercules might be (as I believe she was) outside the channel to the north, in which case it certainly was one of the possibilities that she would attempt a starboard to starboard passing close to the bend. In this situation a passing agreement was imperative and when it became evident that no agreement would be reached the only safe thing for him to do was to stop his engines and blow the attention signal.

As to the Hercules, there was even more need for a passing agreement. Although outside the channel she was nevertheless

not far from its edge and her master testified that when he made his turn he headed to pass inside the "C" buoy which would have brought him (and perhaps did bring him) into the channel and place him in a passing position in a narrow channel on the wrong side of the Moran. Whatever the reasons for this maneuver, it clearly should have been attempted only after a passing agreement had been reached.